UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| CEDRICK LOCKETT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 19-CV-0593-CVE-CDL |
| | ) |
| WEBCO INDUSTRIES, INC., | ) |
| previously named as Webco, Inc. | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

Now before the Court is Defendant's Motion for Summary Judgment and Brief in Support (Dkt. # 40). Defendant Webco Industries, Inc. (Webco) argues that plaintiff's employment was terminated after he failed to comply with testing procedures for a random drug test, and there is no evidence suggesting that plaintiff's employment was terminated because of his race. Plaintiff responds that Webco invaded his privacy in the manner that the drug test was conducted, and he claims that he was subject to a hostile work environment due to Webco's mishandling of allegations of racial discrimination during his employment.

**I.**

On June 29, 2017, Webco hired Cedrick Lockett as an employee in its stainless steel division at its Mannford, Oklahoma plant. Dkt. 40-1, at 1. Webco manufactures a variety of industrial tubing products, and Lockett's primary job duties included cutting tubes to length, deburring cut tubes, and packaging and tagging tubes. Id. Lockett attended new employee training and received a copy of the employee handbook, and Lockett acknowledged that he had received the handbook and was responsible for complying with Webco's policies and procedures. Dkt. # 40-2, at 16-18. Webco has

an equal employment opportunity policy that requires all employees to be afforded equal opportunities regardless of the employee's age, race, religion, gender, national origin, disability, or any other protected status. Dkt. # 40-3, at 8. Any employee who experiences or witnesses discriminatory conduct had the responsibility to immediately report the conduct to his or her supervisor, except that the employee could approach another manager or the human resources department if the complaint involved the employee's supervisor. Id. The employee handbook contains a workplace violence policy prohibiting employees from engaging in verbally or physically threatening behavior toward another employee. Dkt. # 40-4, at 1. Lockett acknowledged that Webco had a drug testing policy, and Lockett was advised that he would be required to take a drug test as a condition of employment. Dkt. # 40-2, at 116. The drug testing policy also advised employees that "[a]ll employees will be subject to random testing for drugs; no employee will be exempt from the possibility of a random test." Id. at 121.

The general business manager of Webco's Mannford plant was Chris Opitz, and Lockett had a good working relationship with Opitz for most of his tenure with Webco. Id. at 39. Opitz told Lockett that he had "big plans for [Lockett's] future with the company," although Lockett testified in his deposition that he questioned Opitz's sincerity later in his employment. Id. at 108; Dkt. # 40-5, at 1. Lockett was engaged in a custody dispute with the mother of his son, and he felt comfortable seeking advice from Opitz about this issue. Dkt. # 40-2, at 40-41. Opitz loaned Lockett money after the mother of son allegedly slashed the tires of Lockett's vehicle. Id. Lockett described Webco as a "great" place to work and he stated in his deposition that Webco "took great care of [him]." Id. at 42.

On October 25, 2018, Lockett was at work and became upset after the Oklahoma City Thunder lost a basketball game. Dkt. # 40-5, at 1. Lockett was talking to two white co-workers, Jason Boudreaux and Scott Burris, and Lockett used the "n" word multiple times when referring to a Thunder player. Id. Another white employee, Todd Langford, overheard the conversation and made an inappropriate attempt at humor by using a variation of the language used by Lockett. Id. at 2. Langford allegedly said that he used the "n" word to get a reaction out of Lockett, and Lockett states that he "flipped" and "gave him a reaction." Dkt. # 40-2, at 90. Lockett told Langford that he was going to kick Langford's "ass." Id. at 91; Dkt. # 40-3, at 2. Boudreaux, not Lockett, reported the incident to Opitz, and Webco opened an investigation into the incident. Id. at 2. Webco determined that Langford violated Webco's anti-harassment policy and he was suspended without pay for two days. Dkt. # 40-3, at 2. Webco found that Lockett violated the company's anti-harassment policy by threatening to use physical violence against a co-worker, and Lockett received a verbal warning. Id. Lockett requested a meeting with the human resources manager, Shelley Shoemaker, and Opitz believes that Lockett wanted the meeting to discuss the encounter with Langford. Dkt. # 40-2, at 96; Dkt. # 40-3, at 2. A meeting was scheduled for October 30, 2018 but, on the day of the meeting, Lockett declined to attend the meeting. Dkt. # 40-3, at 2. Lockett claims that he had a panic attack and could not go through with the meeting. Dkt. # 40-2, at 97. Opitz followed up with Lockett about the incident with Langford, and Lockett assured Opitz that he was satisfied with the way the situation had been handled. Id. Opitz believed that the situation had been resolved to Lockett's satisfaction. Id.

Webco manufactures tubing using a "separation string" method, in which a loop is tied at one end of a string and the string is eventually pulled through the loop after being wrapped around

several tubes. Dkt. # 40-5, at 3. On December 9, 2018, Lockett sent a picture of a rope left at a work station that he believed had been tied into a "noose." Dkt. # 40-2, at 98; Dkt. # 40-5, at 3. The picture had actually been taken by Lockett in July 2018, and he did not report the incident to Opitz until December 2018. Dkt. # 40-2, at 98-99. Opitz opened an investigation after receiving the picture, and Lockett claimed that the rope had been left at the work station by a co-worker named Darren. Dkt. # 40-2, at 105-06. After completing his investigation, Opitz determined that Darren had either not left the string in the work area or had not done so with the intent to harass Lockett. Dkt. # 40-5, at 3. Opitz met with Lockett to discuss his findings, and he believed that the situation was fully resolved after the meeting. Id. In January 2019, Lockett received a promotion to the skill level of "expert" and Lockett was permitted to teach a class to his co-workers. Dkt. # 40-2, at 86-87, 109-11.

On April 25, 2019, Lockett was randomly selected for a drug test along with several other employees of Webco. Dkt. # 40-7, at 1. The drug test was administered by a third-party, One Source Occupational Medicine (One Source), and the One Source medical review officer who was present to administer the drug test was female. Id. at 2. Lockett provided a urine sample for the drug test, but the sample was outside of the acceptable temperature range and did not satisfy the testing requirements. Id. Lockett was told that he would have to give another sample, and he ran out of the building, jumped over a fence, and removed something from his car. Id. Lockett states that he thought there was something "fishy" going on and he wanted to retrieve his phone to record what was occurring. Dkt. # 40-2, at 50-52. Lockett knew that it was against Webco policy to make audio or video recordings using his phone while inside the plant. Id. at 52-53. Lockett returned to the testing site and was informed that he could not leave the testing site without a supervisor. Id. at 57.

The medical review officer also told Lockett that he would have to give an observed sample, and Lockett became upset. Dkt. # 40-7, at 2. Sarah Donegan, Webco's new human resources manager, told Lockett that his employment would be terminated if he refused to follow testing procedures, and Lockett agreed to give an observed sample. Id. Robert Smith, a Webco supervisor, went with Lockett while gave a second urine sample, and Lockett gave the sample but obstructed Smith's view. Dkt. # 40-2, at 62-64; Dkt. # 40-7, at 2-3. The second sample was also outside of the acceptable temperature range, and Lockett was instructed that he had to give another observed sample. Dkt. # 40-2, at 65-67; Dkt. # 40-7, at 3. The medical review officer for One Source called her supervisor, and she was advised that Lockett's failure to give a third sample would be treated as a positive test. Dkt. # 40-7, at 3. Lockett became even more upset and said "fuck this drug test," and he began making allegations that the drug testing was racially motivated. Dkt. # 40-2, at 78; Dkt. # 40-7, at 3. Lockett refused to give a third sample and left work, and he knew that he would be fired if he left Webco's facility without providing a useable sample for a drug test. Dkt. # 40-2, at 66, 71. During his deposition, Lockett admitted that he was upset with the testing procedure and "[d]iscrimination have [sic] no part with that drug test." Id. at 70. Lockett's employment was formally terminated on April 25, 2019 due to his failure to comply with the drug testing requirements. Id. at 81.

Lockett filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) alleging that his employment was terminated because of his race and in retaliation for engaging in protected activity. Dkt. # 40-8, at 1. Lockett subsequently filed a pro se complaint alleging racial discrimination claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (Title VII) under hostile work environment and retaliation theories. He also alleges a state law claim of invasion of privacy based on the drug testing procedures.

5

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

### III.

Webco seeks summary judgment on plaintiff's Title VII claims and his state law claim of invasion of privacy. Dkt. # 40. Webco argues that it promptly dealt with plaintiff's allegation that Langford used racially offensive language, and there is no evidence that the separation string incident or the selection of plaintiff for a random drug test were racially motivated. Dkt. # 40, at 20-25. Webco also argues that plaintiff cannot establish a prima facie case of retaliation under Title VII, and Oklahoma law is clearly established that drug testing by employers is not an invasion of privacy. Id. at 26-30. Plaintiff has filed a response (Dkt. # 43) opposing Webco's request for summary judgment as to his hostile work environment and invasion of privacy claims, but he offers no response in support of his retaliation claim.

### A.

Webco argues that plaintiff has not come forward with evidence establishing a genuine dispute of fact that he was harassed because of his race or that any harassment was severe or pervasive. Dkt. # 40, at 20. Plaintiff responds that Langford's conduct and the "noose" incident were related to his race, and these incidents tend to show that the workplace environment was racially hostile. Dkt # 43, at 11-16.

To establish a prima facie case of hostile work environment, a plaintiff must show that: (1) he is a member of a protected group; (2) he was subject to unwelcome harassment; (3) the harassment was based on his membership in a protected group; and (4) due to the harassment's severity or pervasiveness, the harassment altered a term, condition, or privilege of plaintiff's employment and created an abusive working environment. Harsco Corp. v. Renner, 475 F.3d 1179, 1186 (10th Cir. 2007). The Tenth Circuit has established that the severe and pervasive nature of the

alleged harassment must be established under objective and subjective standards. Harrison v. Eddy Potash, Inc. 248 F.3d 1014, 1023 (10th Cir. 2001). Concerning the subjective aspect of a hostile work environment claim, the victim must show that he "subjectively perceive[d] th[at] environment to be abusive." Id. (second alteration in original). The objective component of a hostile work environment claim requires a plaintiff to present evidence that a "reasonable person" would find the same harassment so severe and pervasive that the workplace is objectively hostile or abusive. Morris v. City of Colo. Springs, 666 F.3d 654, 664 (10th Cir. 2012). A court must consider the totality of the circumstances and consider factors such as the frequency of the discriminatory conduct, the severity, whether the conduct is physically threatening or merely an offensive utterance, and whether the conduct unreasonably interferes with the employee's work performance. Id. The Tenth Circuit has described pervasiveness and severity as "independent and equal grounds" by which a plaintiff may meet this element of a hostile work environment claim, but the grounds "'are, to a certain degree inversely related; a sufficiently severe episode may occur as rarely as once . . . , while a relentless pattern of less harassment that extends over a long period of time also violates the statute.'" Tademy v. Union Pac. Corp., 614 F.3d 1132, 1144 (10th Cir. 2008) (quoting Cerros v. Steel Techs, Inc., 288 F.3d 1040, 1047 (7th Cir. 2002)). An employer can be held vicariously liable for an employee's unlawful harassment if the employee was a supervisor, but otherwise an employer can be found liable if it was negligent in allowing a hostile work environment to exist. Vance v. Ball State Univ., 570 U.S. 421, 428 (2013).

Webco does not dispute that plaintiff is a member of a protected group or that he was subject to harassment on at least one occasion. However, Webco does challenge plaintiff's assertions that the "noose" incident was related to his race and that Webco was negligent in the manner that it

responded to Langford's conduct. The Court will initially consider whether Webco's handling of Langford's racially offensive language contributed to a hostile work environment. Langford was simply a co-worker, not a supervisor, and Webco can be held liable for Langford's conduct only if it was negligent in its handling of Landford's behavior. Vance, 570 U.S. at 428. An employer may be found negligent if it knew or should have known about the harassment but failed to take any action to stop the harassment. Debford v. Mercy Health Sys. of Kansas, Inc., 737 F.3d 642, 650 (10th Cir. 2013). Once an employer becomes aware of harassment, the employer must take reasonable measures to stop the harassment, and stoppage of the harassment shows that the employer's response was reasonable. Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 676 (10th Cir. 1998). Plaintiff did not report Langford's conduct to Webco, but Webco became aware of Langford's conduct due to a report made by a co-worker. Webco immediately investigated the matter and disciplined Langford by suspending him for two days without pay. There is no evidence that Langford or any other employee subsequently engaged in offensive conduct of a similar nature, and this shows that Webco's response to Landford's conduct was reasonable. Plaintiff appears to be arguing that he was "frustrated" with Webco's response, because he was disciplined for making a threat of physical violence against Langford. Dkt. # 43, at 6. However, he does not dispute that he threatened Langford, and Webco was not negligent for taking steps to prevent physical violence in the workplace. The Court also notes that the incident was instigated by plaintiff's use of similar racially offensive language in the workplace and, considering the totality of the circumstances, there is no basis to find that Webco permitted or tolerated racially offensive conduct in the workplace.

Plaintiff also argues that the "noose" incident shows that he was subjected to a racially hostile work environment. On December 9, 2018, plaintiff advised Opitz that a rope in the shape of a noose

had been left at his work station in July 2018, and he sent a picture of the rope to Opitz. Webco states that it uses a "separation string" method to tie tubing together, and Webco has produced a video (Dkt. # 40-6) showing how this process works. Even so, Webco treated the photograph as a possible incident of racial discrimination and opened an investigation. Plaintiff claimed that the rope had been left at his work station by Darren, but Opitz' investigation could not confirm that Darren was actually responsible for leaving the rope at plaintiff's work station. Plaintiff has not provided any evidence in response to defendant's motion for summary judgment tending to contradict the findings of Opitz's investigation. The Court also notes that plaintiff did not immediately report the incident to Webco, and this made it more difficult to investigate plaintiff's allegations of racial harassment. Plaintiff has not met his burden to show the "noose" incident was racially motivated or that Webco mishandled his allegations of racial discrimination. The Court has fully reviewed plaintiff's pro se response (Dkt. # 43) and finds no other arguments concerning possible acts of discriminatory conduct.[1] Therefore, plaintiff has not shown that the discrimination in the workplace was so severe or pervasive that it altered a term or condition of his employment, and summary judgment should be entered in favor of Webco as to plaintiff's hostile work environment claim under Title VII.

B.

Webco argues that there is no temporal proximity between any protected conduct and plaintiff's termination, and plaintiff cannot establish a causal connection between the protected

---

[1] Webco's motion for summary judgment references two acts that allegedly occurred in 2017 and argues that these acts are too temporally remote to be related to plaintiff's hostile work environment claim. Dkt. # 40, at 18. Plaintiff does not rely on these two acts in his response, and the Court will not attempt to construct an argument on behalf of plaintiff as to the relevance or admissibility of the two acts referenced by Webco.

activity and an adverse employment action. Dkt. # 40, at 26. Plaintiff makes no response to this argument, and Webco argues that has confessed or abandoned his retaliation claim. Dkt. # 44, at 1. Plaintiff is proceeding pro se and the Court will consider whether plaintiff can establish a prima facie case of retaliation under Title VII.

Under Title VII, it is unlawful for an employer to take any adverse action against an employee for filing a charge or reporting acts of alleged workplace discrimination. 42 U.S.C. § 2000e-3(a). To prove a prima facie case of retaliation, plaintiff must show that: (1) he engaged in protected opposition to discrimination; (2) his employer took an adverse employment action against him; and (3) there is a causal connection between the opposition and the adverse action. Stover v. Martinez, 382 F.3d 1064, 1071 (10th Cir. 2004). The law is clear that reporting workplace discrimination to the EEOC is protected behavior. Anderson v. Coors Brewing Co., 181 F.3d 1171, 1178 (10th Cir. 1999); McCue v. State of Kansas, Dep't of Human Resources, 165 F.3d 784, 789 (10th Cir. 1999). An employee may establish causation by showing that the adverse employment action occurred soon after the protected activity. Annett v. University of Kansas, 371 F.3d 1233, 1239-40 (10th Cir. 2004); Burrus v. United Tel. Co. of Kansas, Inc., 683 F.2d 339, 343 (10th Cir. 1982). "Unless there is a very close temporal proximity between the protected activity and the retaliatory conduct, the plaintiff must offer additional evidence to establish causation." O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1252 (10th Cir. 2001). If the plaintiff can establish a prima facie case of retaliation, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. Pinkerton v. Colorado Dep't of Transp., 563 F.3d 1052, 1064 (10th Cir. 2009). If the employer comes forward with a legitimate, non-

discriminatory reason for its actions, the burden shifts to the employee to show that employer's stated reason is pretextual. Id.

On December 9, 2018, plaintiff contacted Opitz to complain that he found a "noose" near his work station in July 2018, and Webco treated the matter as a complaint concerning possible harassment due to plaintiff's race. Opitz investigated the matter and rejected plaintiff's assertion that the incident constituted racial harassment. Plaintiff's employment was terminated on April 25, 2019 after he violated Webco's random drug testing policy and failed to provide a useable sample. The Court finds no close temporal proximity between plaintiff's protected activity and his termination, and he has the burden to come forward with other evidence tending to show a causal connection between the protected activity and the adverse employment action. Even if the Court assumed that plaintiff could establish a prima facie case of retaliation, Webco terminated plaintiff's employment after he failed to comply with the drug testing procedures, and plaintiff has admitted that the drug testing was not racially motivated. Dkt. # 40-2, at 70. There is no evidence in the summary judgment record suggesting that Webco's stated reason for terminating plaintiff's employment was pretextual, and Webco is entitled to summary judgment on plaintiff's retaliation claim.

### C.

Webco argues that Oklahoma law permits employers to require employees to participate in random drug testing, and the testing procedures used in this case complied with Oklahoma law for collecting urine samples. Plaintiff responds that Webco was negligent by failing to ensure that One Source had necessary medical personnel on-site to observe samples, and he claims that it was highly offensive to give an observed sample in the presence of a Webco supervisor. Dkt. # 43, at 10.

Oklahoma courts recognize the tort of invasion of privacy by intrusion upon a person's seclusion, and this tort has two elements: "(a) a nonconsensual intrusion (b) which was highly offensive to a reasonable person." Gilmore v. Enogex, Inc., 878 P.2d 360, 366 (Okla. 1994). This tort is not available for every intrusion upon a person's privacy, and the Oklahoma Supreme Court has noted that "[t]here is simply no room in the framework of our society for permitting one party to sue on the event of every intrusion into the psychic tranquility of an individual." Munley v. ISC Financial House, Inc., 584 P.2d 1336, 1338 (Okla. 1978). An intrusion occurs only when "an actor 'believes, or is substantially certain, that he lacks the necessary legal or personal permission to commit the intrusive act.'" Dubbs v. Head Start, Inc., 336 F.3d 1194, 1221 (10th Cir. 2003). The Oklahoma Supreme Court has favorably cited Restatement (Second) of Torts § 652B, and the Restatement broadly describes the types of activities that can constitute an invasion of privacy:

> The invasion may be by physical intrusion into a place in which the plaintiff has secluded himself, as when the defendant forces his way into the plaintiff's room in a hotel or insists over the plaintiff's objection in entering his home. It may also be by the use of the defendant's senses, with or without mechanical aids, to oversee or overhear the plaintiff's private affairs, as by looking into his upstairs windows with binoculars or tapping his telephone wires. It may be by some other form of investigation or examination into his private concerns, as by opening his private and personal mail, searching his safe or wallet, examining his private bank account, or compelling him by a forged court order to permit an inspection of his personal documents. The intrusion itself makes the defendant subject to liability, even though there is no publication or other use of any kind of the photograph or information outlined.

RESTATEMENT (SECOND) OF TORTS § 652B (AM. LAW. INST. 1977).

The Court finds that Webco was permitted under Oklahoma law to require plaintiff to participate in random drug testing, and Webco could not have believed that it lacked the legal authority to conduct such testing or require that plaintiff give an observed sample after providing an

13

unuseable sample. The Oklahoma Supreme Court has determined that workplace drug testing programs do not invade an employee's privacy, because the employer has a significant interest in maintaining a drug-free workplace and such testing is not highly offensive to a reasonable person. Gilmore v. Enogex, Inc., 878 P.2d 360, 366-67 (Okla. 1994). The Oklahoma State Department of Health has promulgated regulations concerning drug testing programs in the workplace, and the Oklahoma Administrative Code provides that:

> (12) Immediately after the specimen is collected, the collection site person shall measure the temperature of the specimen. The temperature measuring device used shall accurately reflect the temperature of the specimen and not contaminate the specimen. The time from urination to temperature measurement is critical and in no case shall exceed four (4) minutes.
>
> (13) If the temperature of a specimen is outside the range of 32 -37°C/90-100°F, that is a reason to believe that the individual did alter or substitute the specimen, and another specimen shall be collected under direct observation of a same gender collection site person and both specimens shall be forwarded to the testing facility for testing. An individual may volunteer to have an oral temperature taken to provide evidence to counter the reason to believe the individual did alter or substitute the specimen caused by the specimen's temperature falling outside the prescribed range.

OKLA. ADMIN. CODE § 310.638-1-8(12)-(13). There is no dispute that the first specimen provided by plaintiff was outside the acceptable temperature range, and this provided a legitimate basis for One Source to believe that plaintiff had tampered with the sample. Plaintiff complains that Webco was negligent in failing to ensure that the third party testing agency had medical personnel on site to observe samples if necessary. Dkt. # 43, at 10, 17. However, Oklahoma regulations require only that the person observing a second sample be of the same gender, and plaintiff has cited no authority that the observation must be conducted by a medical professional. Plaintiff alleges that the person observing him touched his shoulder while he was giving the second sample. Id. at 10. However, this would not be highly offensive to a reasonable person, and Oklahoma law clearly establishes that

Webco had the legal authority to require plaintiff to participate in a drug testing program and require an observed sample under the circumstances present in this case. Plaintiff may subjectively believe that the testing procedures were an invasion of privacy, but he has not shown that Webco lacked legal authority to require a second observed sample or that the testing procedures were highly offensive to a reasonable person. Therefore, summary judgment is entered in favor of Webco on plaintiff's invasion of privacy claim.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment and Brief in Support (Dkt. # 40) is **granted**. A separate judgment is entered herewith.

**IT IS FURTHER ORDERED** that the pending motions in limine (Dkt. ## 25, 26, 27, 28, 29, 30) are **moot**.

**DATED** this 20th day of May, 2021.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE